UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 7:19-CR-475-LSC-GMB |
| ) | Judge L. Scott Coogler |
| ALAA MOHD ABUSAAD, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, **ALAA MOHD ABUSAAD**, by and through her attorneys, **THOMAS ANTHONY DURKIN**, **SAMUEL R. HOLMES**, and **STEVEN RANDALL HORTON,** pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, 18 U.S.C. §3553(a), as well as the opinions of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009), respectfully submits Defendant's Sentencing Memorandum.

**I.     INTRODUCTION**

As the Court is aware, the Plea Agreement in this case provides that the United States and the Defendant will recommend the maximum term of imprisonment of 10 years. (Dkt. #7, ¶V, p.7) However, this agreement is subject to the government's filing of a motion for reduction of sentence pursuant to Fed.R. Crim.P. 35(b). (Dkt. #7, p. 1). In that it is counsel's understanding that the government intends to file such a motion and recommend a sentence of 90 months, this memorandum is necessarily filed, therefore, in support of the government's motion and recommendation based upon all the factors that the Court must consider under 18 U.S.C. §3553(a). And, as the sentencing recommendation of the parties is not binding on the Court (Dkt. #7, ¶ VII),

counsel respectfully submits that an analysis of the § 3553(a) factors more than justifies the government's recommendation; and, for that matter, an even lower sentence should the Court see fit to exercise its discretion under the § 3553(a) factors as the plea agreement permits.

This is the case since as the Court is well aware, it must fashion a sentence under the § 3553(a) factors that is *sufficient, but not greater than necessary to accomplish the multiple goals of sentencing.* Counsel submit, therefore, that a careful analysis of all of the § 3553(a) factors in this case certainly supports the government's recommendation of 90 months; but could also be said to weigh heavily in the exercise of discretion further downward, especially in light of the consequences of the pandemic on the conditions of Ms. Abusaad's pre-trial confinement of now over 41 months. This is all the more the case here in light of the cooperation she has provided the government and the maturity that she has gained in the course of her pre-trial confinement which is exemplified in her attached letter to the Court marked Exhibit A, dated April 5, 2021, which was written spontaneously by Defendant without any suggestions or edits by counsel.[1] It is a remarkable allocution—one that clearly demonstrates that a different woman stands before the Court than the young girl that was arrested on these charges in 2018.

    A. **18 U.S.C §3553(a) Factors**

        1. **Nature and Circumstances of the Offense and The History and Characteristics of the Defendant Under 18 U.S.C §3553(a)(1)**

           **A. Alaa's lonely early life and mental health issues made her vulnerable to the dangers of the internet.**

At its core, this is a very sad and complicated case involving a lonely and confused young Muslim girl caught between two conflicting cultures and her misbegotten attempt to find meaning and companionship on the internet. In many ways, she readily fits President Obama's poignant 2014 comment at the United Nations with respect to the coercive propaganda of terrorist

---

[1] A copy of this letter has been previously supplied to the government.

2

organizations on the internet.[2]  For most of her young life and for all intents and purposes, Alaa's social world was non-existent outside of the internet.  Up until she married her husband in May of 2018, whom, not coincidentally, she met on the internet, she had virtually zero meaningful friendships in real life outside of her siblings.[3]  In fact, when undersigned counsel and his law partner first interviewed her at the Shelby County Jail in March of 2019, Alaa expressed dismay that someone she literally described as "her best friend" turned out to be an FBI undercover employee. This, in many ways, says it all with respect to her life of isolation on the internet.

This social isolation and naivety can in large part be seen as the byproduct of Alaa's upbringing and family dynamic.  Born in Chicago and brought to Alabama after her parents' divorce at age ten, her family of two brothers and six sisters was alienated from other neighbors due to being the only Muslim family in the housing projects in Tuscaloosa, where Alaa often was bullied by her peers. Previously undiagnosed mental health issues that she has experienced since childhood only added to her awkwardness and isolation—as did her strict Muslim upbringing with its attendant sheltering of unmarried women from the outside world.

Thus, her willingness to seek out friendship and meaning online, where she tried desperately to fit in and gain approval of people she had never met outside of social media, can be readily understood from the more detailed explanation of her childhood issues set out in the PSR

---

[2] The President's full quote is as follows: "That [rejecting the ideology of ISIL] means contesting the space that terrorists occupy, including the Internet and social media. Their propaganda has coerced young people to travel abroad to fight their wars and turned students – young people full of potential – into suicide bombers. We must offer an alternative vision." *Remarks by President Obama in Address to the United Nations General Assembly*, Sep. 24, 2014, (available at: https://bit.ly/3tnfinR). Whether the government was unable to do so adequately through meaningful countering violent extremism ("CVE") programs is quite another matter. *See*, e.g., Fiza Patel and Meghan Koushik, *, Countering Violent Extremism,* Brennan Center for Justice at New York University School of Law(available at https://www.brennancenter.org/sites/default/files/publications/Brennan%20Center%20CVE%20Report_0.pdf)  (last visited April 21, 2022).

[3] In following with her inability to forge relationships outside of the internet, Alaa also initially met her husband on social media; this relationship, set forth in the PSR at ¶43, will also be described in further detail below.

3

at ¶41-50[4] and below.  This is also especially clear from the report of Dr. Steven Xenakis, a retired U.S. Army Brigadier General and a well-known psychiatrist with considerable national experience in terrorism related cases.[5]  His report, dated January 12, 2022 is attached hereto as Exhibit B. It is in this virtual environment that the deeply immature and naïve young woman came into contact with individuals whom she wanted to please, and ultimately led to her interactions with her "best friend," the FBI's undercover employee.

Further, the previously undiagnosed, and currently unmedicated, mental health issues set forth in the Xenakis report militate strongly for consideration under § 3553(a).[6] It is painfully obvious from reading of the PSR and the report of Dr. Xenakis that this offense conduct came from a place of overwhelming and heartbreaking loneliness, and the untreated Major Depressive Disorder in particular, and not from any kind of long-term political commitment to terrorism or political violence. This context is not in any fashion intended to provide an excuse for her actions, which she readily acknowledges in her letter as being quite serious, but rather to provide context and guidance to the history and characteristics of the defendant.

> B. **Ms. Abusaad has accepted complete responsibility and cooperated fully with the government and has matured while incarcerated.**

Clearly, Ms. Abusaad has also shown great remorse for her conduct and accepted full responsibility for her offense, as was noted by Probation. (PSR, ¶22, 32-33), and quite jumps off

---

[4] For example, the PSR states that Ms. Abusaad "recalled being bullied by other children, especially during elementary school.  She explained that she was insulted and called names by the other children, who sometimes slammed their hands on her desk."  (PSR, ¶46).

[5] An expert report prepared by Dr. Stephen N. Xenakis is attached hereto as Exhibit B, which will also be discussed in further detail below. The report contains, among other things, Dr. Xenakis' extremely impressive Curriculum Vitae. Undersigned counsel first met Dr. Xenakis while being counsel in the 9/11 Conspiracy Case in the Military Commissions in Guantanamo Bay Cuba, *United States v. Khalid Shaikh Mohammed, et al.*  Dr. Xenakis was the forensic psychiatrist in the widely publicized case of the young teen Al Qaeda member, Omar Khadr. See, *United States v. Omar Ahmed Khadr*, 717 F.Supp.2d 1203 (U.S.C.M.C.R. 2007). See CNN, *Youngest Guantanamo detainee pleads guilty*, October 25, 2010 (last visited April 20, 2022) (available at http://www.cnn.com/2010/US/10/25/khadr.plea/)

[6] Dr. Xenakis concludes that defendant suffers from Major Depressive Disorder (DSMV-V 296.23) and Attention Deficit Disorder (DSMV-314.00) (Ex. B, p 6)

4

the page of her letter in allocution. As mentioned, it is quite accurate to say that the same woman who stands before the Court for sentencing, is not the same naïve, immature and socially isolated young girl attached to the internet in 2018. She has come a long way from the confused, awkward, and naïve young girl that undersigned counsel met several years ago when they first appeared this case. While incarcerated, she has had to learn to be more discerning of her surroundings and other people, and has been forced to mature into more of a real adult than the child-like, naïve person her family has described her as prior to her incarceration.

It should also not go unnoted that Alaa has already been incarcerated pre-trial at the Shelby County Jail in Columbiana for almost four years throughout the duration of these proceedings, including during the incredibly harsh conditions brought on by the height of the COVID-19 pandemic in early 2020, and again with the highly transmissible Omicron variant that recently raged throughout the country. In fact, at the time of this writing she has already served almost 42 months in federal custody under unusually harsh conditions.

Through it all, Ms. Abusaad continues to have an incredibly supportive local family in Tuscaloosa, as well as a very supportive father in Chicago, and her husband overseas; all of whom are more than willing to help her hold herself to her new outlook on life. And, Alaa commits never to fall back into her old habits of withdrawing to the cyber world that led her to this place. She also hopes very much to return to her academic studies, which she deeply regrets having derailed through her conduct.

    **C.**    **The One-Size-Fits-All Guidelines**

Additionally, this case and this Court's decision on discretion of a sentence sufficient but not greater than necessary, cannot be fully addressed without analyzing the rather unique pitfalls of the draconian sentencing guidelines' terrorism enhancement. Rather than providing nuance and guidance to sentencing in terrorism related sentencing, the Sentencing Commission has opted for

5

a one-size-fits-all warehousing approach.  As the Court is aware, and the PSR acknowledges (PSR, ¶26), any defendant convicted of a terrorism related offense automatically obtains a 12-point increase in the Base Offense Level.  To make matters worse, the defendant also gets automatically placed in Criminal History Category VI, even if, as here, the case is the Defendant's first arrest. (PSR, ¶37). This, in many ways, greatly skews anything close to a nuanced consideration of individualized sentencing. For example, the starting point for the guidelines range of 151 to 188 months, is brought down to 120 months due to the conviction's statutory ten-year maximum.  This is a far cry from what would otherwise be the 70–87-month range for a Base Offense Level 20 without the 12-point increase for the terrorism enhancement.  (PSR, ¶24). Without the terrorism enhancement, therefore, and with the agreed three-point decrease for acceptance of responsibility, Ms. Abusaad would be facing a guidelines range of only 51-63 months—very close, if not a sentence of time served.

      Thus, counsel would urge that while the Court considers the terrorism enhancement as its starting point, as it must, it also should read the thoughtful concurring opinion of Judge Guido Calabresi of the Second Circuit in the controversial case of *United States v. Lynn Stewart,* 590 F.3d 93, 154 (2d Cir. 2009), in which he considers the potential draconian application of the terrorism enhancement and observes as follows: "When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in United States v. Booker, 543 U.S. 220, 244 (2005)."[7]

---

[7] For example, as Judge Calabresi points out the same enhancement applies whether "the terrorist whom the defendant funds attempts to detonate an explosive in a public place, but the explosives do not go off properly and so cause only a few injuries and on death that results, in part also from inadequate medical treatment... and in [a] second case [where] the terrorist's detonation attempt succeeds, blowing up a city bus and causing a major traffic collision that kills or injures hundreds of people." See United States v. Stewart, 590 F.3d 93, 157 (2d Cir. 2009). Again, from these examples, the enhancement would also apply equally to someone sending $100.00 to Hamas. The list of discrepancies in this application are virtually endless.

Further, while admittedly an outlier case, Judge Milan D. Smith, Jr. of the 9th Circuit articulated in the recent case that the terrorism enhancement does not automatically apply to all material support offenses. *United States v. Amer Sinana Alhaggagi,* 978 F.3d 693, 699 (9d Cir. 2020). It is possible for a defendant to provide material support to a terrorist group without intending that the support or resources would influence, affect, or retaliate against government conduct. *Id.* The standard to analyze the applicability of the terrorism enhancement is also outlined in *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010). There, the Second Circuit explained that the disjunctive phrase from U.S.S.G. § 3A1.4, —if the offense involved, OR was intended to promote, a federal crime of terrorism——makes clear that the predicate offense must either: (1) involve a federal crime of terrorism; or, (2) be intended to promote a federal crime of terrorism, and that each clause has a separate meaning. *Id.* at 313.

While Ms. Abusaad has conceded by the Plea Agreement that the Terrorism Enhancement applies (Plea Agreement, pp. 5-6), it should not go unnoticed, as already mentioned, that but for the Terrorism Enhancement, Ms. Abusaad's guidelines range would be a mere 51-63 months. That is, a sentence well below the range of time-served with credit for good time.[8] While counsel are not walking back the agreement that the terrorism enhancement is applicable as it has been found to be in virtually all other material support cases,[9] this is a factor that could well be considered under § 3553(a)(1).

While this by definition is a terrorism related offense that will continued to have draconian affects upon defendant's future there are cases such as this that might not meet a layman's

---

[8] As of April 20, 2022, Alaa has been detained pre-trial for 41 months and 28 days.
[9] *US v. Jayyousi,* 657 F.3d 1085, 1115 (11d. Cir. 2011) (Terrorism Enhancement applied to defendant conspiring to provide material support to terrorism organization to advance violent jihad); *U.S. v. Suarez,*, 893 F.3d 1330, 1336-37, (11d. Cir. 2018)(Terrorism Enhancement applied to defendant who provided material support to terrorist organization and was attempting to construct an explosive device); *United States v. Van Haften,* 881 F.3d 543, 544 (7d. Cir. 2018). (Terrorism Enhancement applied to defendant attempting to join ISIS and seek revenge against United States government).

perception of terrorism and the violence usually associated with it. And counsel would submit that this offense conduct, while certainly serious, was hardly an immediate threat to the country's national security. Again, saying this is not, however, an attempt to excuse the conduct or minimize it; but only to provide context and mitigation. Sadly, had Alaa or her family had the resources and awareness to confront some of her growing mental health issues earlier, it is quite unlikely she would find herself before this Court today.

In order to appreciate this more fully it is helpful to get a sense of her rather unusual and complicated background from the many impressive and heartfelt letters in support, attached as Exhibit C. [10] Alaa was born in Chicago, a middle child among her seven siblings. When Alaa was ten years old, her parents divorced. Her father stayed in Chicago, while her mother moved Alaa and her seven siblings to Tuscaloosa where they then needed to rely on government assistance and became the only Muslim family in the public housing projects. As her mother Fayeza recalls, "As a single mother of eight children, there have been times where things have not been easy for me." (*See* F. Abuzer Letter). As a child, Alaa was alienated from her community both due to the cultural differences as well as then-undiagnosed mental health issues and was bullied by her peers.

As described in the PSR, Abusaad "recalled being bullied by other children, especially during elementary school. She explained that she was insulted and called named by other children, who sometimes slammed their hands on her desk." (PSR, ¶46). Her brother Ebrahim writes, "Growing up Alaa was easily the smallest one of us physically, I guess that's why it was easy for people to pick on her when we were children." (*See* E. Abusaad Letter). Alaa has also written numerous detailed letters to counsel and Dr. Xenakis regarding these experiences, of which a few

---

[10] There are thirteen (13) character letters attached as group Exhibit C. They are from the following individuals: William E. Richardson (Physics Instructor, Shelton State Community College); Nada Dibas (Prisoner and Family Support Coordinator, Coalition for Civil Freedoms); Karen K.R. Bradley (family friend); Belgacem Ghmougui (husband); Fayeza Abuzer (mother); Mohd Abusaad (father), and her five sisters (Kawther, Ayah, Noor, Huda, and Tasneem) and two brothers (Ebrahim and Yahya).

examples are provided here: In elementary school, others mocked her for being too poor to have the latest video games or even her own backpack. After she started wearing a hijab daily to school in seventh grade, the bullying escalated even further, including a physical attack from a fellow student who hit her in the neck. On another occasion, a student yelled "Terrorist" at her as she walked by a classroom; she dealt with ignorant and racist questions like being asked if Osama bin Laden was her uncle. In yet another hurtful memory, Alaa recalls being told by an adult teacher that she would go to Guantanamo Bay for taking a poster that had fallen off the wall. These are just a few of the ruthless, harmful moments that she experienced that had long-lasting effects on her social life and self-image. Feeling she did not quite fully fit in anywhere, whether it was at school or at home or at the mosque, she then retreated into the cyber world of the internet as a refuge and for social interaction.

Alaa has also suffered from intense anxiety and mood swings since she was a child, which contributed to inability to socialize except for on the internet. Dr. Xenakis' report describes Alaa's mental health factors and his diagnoses of Major Depressive Disorder (MDD) and Attention Deficit Disorder (ADD); he also explains how in his professional opinion they would be best treated in a non-carceral setting. His conclusion set forth in the conclusion of his carefully done report is worth replicating in full:

> Ms. Abusaad requires treatment for persistent depression, anxiety, and attention deficit. An effective course of treatment includes therapy, counseling, and psychotropic medications. She requires comprehensive evaluation for somatic aches and pains including joint swelling. She demonstrates willingness to comply with required supervision and oversight if and when released from jail. There is no evidence that continued incarceration benefits her health or further protects the country from dangerous enemy actors.

(Ex. B, Xenakis Report, p. 4).

In their numerous character letters from both parents and each of her seven siblings, Alaa is described as a naïve, sweet, sensitive young woman who made serious efforts to help others

despite her own social difficulties. Her mother Fayeza calls her a "light and an incredible person with a beautiful soul." (F. Abuzer Letter), and her father Mohd remembers that "she was the one who made sure to contact her parents daily to check on us, see how our day was going, and make sure we didn't need anything." (M. Abusaad Letter).  Her sister Kawther recalls getting cheered up by Alaa's "dad jokes" and that she "has so much more to contribute to the community and to society with her kindness, generosity, and intelligence." (K. Abusaad Letter). Also, her sister Noor recalls how Alaa helped her be patient and forgiving of a person who hit Noor's car in and accident. (N. Abusaad Letter).  Poignantly, her older brother Ebrahim provides an anecdote from when an older sister left for college that provides insight on her economic situation as well as her caring but child-like nature: "Alaa couldn't afford to buy her a parting gift so she wrote her letters to look back at and smile if she ever missed us and drew her pictures of us and put them all in an envelope and gave them to her when she left."  (E. Abusaad Letter).  Additionally, her siblings are deeply grateful that Alaa, who excelled in academics as described further below, has encouraged them in their studies over the years. For example, her sister Ayah writes about how Alaa advised her on her college admissions standardized tests, and her younger brother Yahya remembers her helping him choose his classes. (A. Abusaad Letter; Y. Abusaad Letter).  Her family's letters also detail the stress and financial strain this case has already presented to their lives.

  Ms. Abusaad's husband, Belgacem Ghmougui, has also remained supportive of her, despite her incarceration and his own voluntary removal to his native Tunisia, after being arrested in Ohio by ICE at the time of Defendant's arrest in October of 2018.  In a character letter written on Alaa's behalf, Belgacem also describes her good nature; but also notes her naïve social qualities that in real life come off as child-like but that on the internet made her vulnerable to dangerous individuals.  For example, Belgacem writes, "She have a very playful and childish soul. She would run to the candy isle [*sic*] in Walmart and yell candy! candy! She would jump on the couch and

yell Jump! Jump!" (*See,* B. Ghmougui Letter). Once they were married and living together, Belgacem attempted to help her adapt to adult responsibilities, such as teaching her how to drive a car. He wanted her to have "a real life with a religious man, not an online life with fake religious and extreme people." *Id.* Belgacem describes Alaa as easily tricked, and not someone who understands politics, but is driven by wanting to connect with and help others, even though she barely knows how. Unfortunately, by the time Ms. Abusaad moved to Ohio and had finally found the companionship she had been looking for in her husband, it was too late, as she had already committed her offense conduct and was soon to be arrested.

Before her incarceration, Ms. Abusaad excelled in her academic studies despite her unprivileged difficult background. She received her Associate's Degree from Shelton State Community College in 2016, and she was in the process of obtaining her Bachelor's degree in geology at the University of Alabama before she married her husband and moved to Ohio with him. In Ohio, she transferred to the University of Toledo where she was trying to finish her degree at the time she and her husband were arrested.[11]

As demonstrated by the letter from her former physics instructor at Shelton State Community College, William Richardson, Ms. Abusaad was an incredible student whose intelligence and work ethic made a significant impression on those around her. "It was not only because of her outstanding academic work that I remember her; Alaa had a profound effect on her classmates as well. Other students would often come to her for help when they ran into a difficult problem or needed an explanation for a laboratory procedure." (*See* W. Richardson Letter). Ms.

---

[11] Her husband was subsequently voluntarily deported in 2019 to his home country of Tunisia. Sadly, the circumstances surrounding her internet marriage itself, its upheaval of her education, and move to another part of the country where she had no other family or social contacts demonstrates as clearly as anything else the same social isolation and desperateness that caused her to seek solace on the internet in the first instance. This is not in any fashion a critique of her husband who has remained very supportive and concerned about Alaa and this case. Nor is it meant to disparage the Islamic custom of arranged marriages. It does, however, speak to the conflicting cultural issues Alaa faced in her early years of transition from a teenager to adulthood.

11

Abusaad deeply regrets jeopardizing her education as a result of her conduct. Ms. Abusaad hopes to be able to return some day to pursuing her studies and achieving her great academic potential, should the Court grant her another meaningful opportunity to do so.

All in all, Ms. Abusaad is a meek, awkward, and tragic young woman who admittedly made a most serious mistake; but she is by no means a hardened, zealous criminal, much less a hardened and zealous terrorist. A strong case can readily be made that she was instead driven by her total loneliness and confused, immature perception of social interactions, and not any serious dedication to political violence.

### 2. A Sentence Sufficient to Comply with 18 U.S.C. §3553 (a)(2)-(7)

After the sentencing judge considers the nature and circumstances of the offense and the history and characteristics of the defendant, as this Court is no doubt aware, it is charged with fashioning a sentence that is sufficient, but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant, and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D). The sentence should also reflect the kinds of sentences available, pertinent policy statements, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(2)-(7). Accordingly, comments on a few of these provisions are pertinent, and will be addressed below.

However, Counsel respectfully submits that the Court should also not ignore the unique realities of the COVID-19 pandemic upon incarcerated individuals.

### a. The Novel Coronavirus (COVID-19) Pandemic

The harsh reality of serving time within the BOP during the pandemic has caused federal judges to address the situations themselves. One District Court, Judge Paul Oetken of the District Court of the District of Columbia explained the harsh reality that inmates face these days:

> [M]ost of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So, I think having served 24 months is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been.

*See United States of America v. Garcia*, No. 18-146 (JDB), 2021 WL 4848700 (D.D.C.) (October 8, 2021) citing Sentencing Tr. at 17-18, United States v. Gonzalez, Case No. 1:18-cr-00669-JPO, ECF No. 250 (S.D.N.Y. April 2, 2021). Another District Court Judge, the well-respected Jed S. Rakoff of the Southern District of New York, reduced a sentence because he opined that the pandemic not only threatened the individual defendant's health, but also made the defendant's "incarceration harsher and more punitive than would otherwise have been the case." *United States v. Rodriguez,* 492 F.Supp.3d. 306, 311 (S.D.N.Y 2020). While Ms. Abusaad has been in federal pretrial custody at the Shelby County Jail, the harsh reality Judge Oetken and Judge Rakoff outline is most certainly, if not more, applicable to inmates incarcerated in other facilities as mitigation efforts for COVID-19 pandemic taken outside prison walls are largely impossible within those walls.

### 2. Other 3553(a) Factors

#### a. The Need to Reflect the Seriousness of the Offense

Pursuant to §3553(a)(2)(A), the Court shall also consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. It simply cannot be said that a person in Ms. Abusaad's circumstances having been arrested and detained in Ohio, taken to Alabama in chains, and having spent almost 42 months

in federal custody, and most of which in the Shelby County Jail during the height of a pandemic, cannot be said to be serious enough to satisfy the requirements of this section. No one could simply say that the time already served, especially in light of the conditions of confinement brought on by the pandemic is a mere slap on the wrist. This has truly been the proverbial "hard time."

    **b.**  **General Deterrence**

Pursuant to §3553(a)(2)(B), the Court shall also consider the need for the sentence to afford adequate general deterrence to criminal conduct. As previously mentioned, this is and has been a hard sentence already, and most certainly should send a loud and clear message to those situated like her who might also be tempted to form meaning and comfort through internet and political activity such as this.

    **c.**  **The Need to Protect the Public**

In determining a sentence, the Court shall also consider the need for the sentence imposed to protect the public from further crimes of the Defendant, pursuant to § 3553(a)(2)(C). As has already been argued and is evident from defendant's letter of allocution this is a truly changed woman who now stands before the court any possible concerns regarding this issue can readily be resolved with the strict conditions of Supervised Release proposed by Probation and readily available to the Court. With the suggested mental health counseling, family support, and guidance of Probation, this Court can rest well assured that Defendant will not be a risk of recidivism.

    **d.**  **The Need to Provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

In determining a sentence, the Court shall also consider the need for the sentence imposed to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, pursuant to § 3553(a)(2)(D). As the

Xenakis report makes clear, Alaa is in need of treatment for her depression which could be far better served on an out-patient basis. And, continuing her college educations as she desperately wishes to resume, is also critical.

### e. The Need to Avoid Unwanted Sentencing Disparities

Pursuant to §3553(a)(6), the Court shall also consider the need for the sentence imposed to reflect the need to avoid unwarranted sentencing disparities among defendants with similar CLU.S.C. § 2339C as opposed to §2339A and B, counsel does not believe there are many statistics to guide the Court. However, one case in particular does stand out as it is a case in which he was lead defense counsel in the Northern District of Indiana. There, the Defendant received a sentence of only 78 months and three years' Supervised Release in circumstances arguably far more culpable than this case. *See United States v. Elhassani*, 2:19-CR-00159-PPS-JEM, (Northern Dist. of Indiana, Nov. 9, 2020). A copy of Judge Phillip Simon's sentencing opinion is attached hereto for the Court's convenience.

### II. CONCLUSION

While the Plea Agreement limits further aggressive advocacy, counsel submit that considerable discretion is in order for all the reasons stated herein.

                                                        Respectfully Submitted,

                                                        /s/ Thomas Anthony Durkin
                                                        **THOMAS ANTHONY DURKIN**

                                                        /s/Samuel R Holmes
                                                        **SAMUEL R HOLMES**

                                                        /s/ Steven Randall Horton
                                                        **STEVEN RANDALL HORTON**

Case 7:19-cr-00475-LSC-GMB   Document 12   Filed 04/25/22   Page 16 of 17

**DURKIN & ROBERTS**
The Rookery Building
209 S. LaSalle St., Suite 950
Chicago, IL 60604
(312) 913-9300
tdurkin@durkinroberts.com

**HOLMES LAW FIRM LLC**
P O Box 11082
Birmingham, AL 35202
205-591-7821 2
05-581-5005 (fax)
srh@holmeslawfirm-al.co

<u>**CERTIFICATE OF SERVICE**</u>

Thomas Anthony Durkin, Attorney at Law, hereby certifies that the foregoing was served on April 25, 2022 in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

<u>/s/ Thomas Anthony Durkin</u>
**THOMAS ANTHONY DURKIN**

**DURKIN & ROBERTS**
The Rookery Building
209 S. LaSalle St., Suite 950
Chicago, IL 60604
(312) 913-9300
tdurkin@durkinroberts.com